PARTIDO POPULAR DEMOCRÁTICO, demandante y apelado, *v.* CARLOS ROMERO BARCELÓ y OTROS, interventores y apelantes; PARTIDO POPULAR DEMOCRÁTICO, demandante y recurrido, *v.* CARLOS ROMERO BARCELÓ, GOBERNADOR DE PUERTO RICO, demandado y recurrente, GERINELDO BARRETO PÉREZ, ETC., demandado y recurrido.

*Números:* O-81-150  *Resueltos:* 8 de mayo de 1981
R-81-118

*Héctor Urgell Cuevas,* abogado del Honorable Gobernador de Puerto Rico, recurrente; *Córdova, Subirá, Gaztambide & Arrillaga,* abogados de los interventores y apelantes; *Miguel Pagán* y *José A. Carlo,* abogados del Administrador General de Elecciones; *Pedro E. Ortiz Álvarez, José A. Andreu García* y *Guillermo Mojica Maldonado,* abogados del Partido Popular Democrático, recurrido.

PER CURIAM: Este caso plantea, esencialmente, una cuestión de interpretación estatutaria: ¿cuál es el procedimiento para llenar una vacante en el cargo de Senador o Representante por un distrito, de conformidad con lo dispuesto en los Arts. 5.006 y 5.007 de la Ley Electoral vigente?([1])

---

([1]) Art. 5.006 "Siempre que ocurriere una vacante en un cargo de Senador o Representante electo como candidato independiente por un distrito o cuando ocurriere una vacante al cargo de un Senador o de un Representante por un distrito nominado por un partido antes de los quince (15) meses precedentes a la fecha de la próxima elección general, el Gobernador, *previa consulta con la Comisión,* convocará, dentro de los treinta (30) días siguientes a la fecha en que se produzca la vacante, para la celebración de una elección especial en el distrito afectado por la vacante surgida. Dicha elección deberá llevarse a cabo no más tarde de los noventa (90) días siguientes a la fecha de su convocatoria y la persona que resulte electa en la misma ocupará el cargo hasta la expiración del término de su antecesor.

"Si dentro de los sesenta días siguientes a la fecha de la vacante el partido al cual pertenecía el legislador del escaño vacante no presenta una candidatura

Los hechos del caso son sencillos. No hay controversia alguna con relación a ellos. En las elecciones generales celebradas el pasado 4 de noviembre, el candidato por el Partido Popular Democrático resultó electo por el Distrito Representativo número 31. Luego de haber tomado posesión de su cargo, falleció el 28 de enero de 1981. Fundándose en una opinión del Secretario de Justicia, el Honorable Gobernador de Puerto Rico promulgó, el 26 de febrero de 1981, una convocatoria(2) para la celebración de una Elección Especial a llevarse a cabo el 24 de mayo de 1981. El ganador de tal elección ocuparía el escaño

para llenar el mismo, se considerará el escaño como si fuere el de un legislador independiente a los fines de la celebración de la elección especial para llenarlo.

"En caso que el cargo vacante correspondiere a un candidato independiente, cualquier elector afiliado a un partido político o persona debidamente cualificada como elector y que reúna los requisitos que el cargo en cuestión exige, podrá presentarse como candidato en dicha elección.

"Cuando ocurriere una vacante en el cargo de Senador o Representante por Acumulación que hubiere sido nominado por un partido, o cuando dentro de los quince (15) meses precedentes a una elección general, ocurriere una vacante en el cargo de Senador o Representante de distrito, se cubrirá la misma por el Presidente de la Cámara correspondiente, a propuesta del partido político a que perteneciere dicho Senador o Representante con una persona seleccionada en la misma forma en que lo fue su antecesor."

Art. 5.007

"Votarán en una elección especial todos los electores de la demarcación geográfica en que la misma deba celebrarse, con derecho a ello conforme la convocatoria al efecto emitida por el Gobernador de Puerto Rico."

(2) "POR CUANTO: El Artículo 5.006 de la Ley Electoral de Puerto Rico, Ley Número 4 del 20 de diciembre de 1977, establece el procedimiento a seguir cuando ocurriere una vacante en un cargo de Senador o Representante por un Distrito nominado por un Partido antes de los quince (15) meses precedentes a la fecha de la próxima Elección General.

"POR CUANTO: El Secretario de Justicia, Interino, emitió una Opinión el 12 de febrero de 1981, en la cual señala que conforme a lo dispuesto en los Artículos 5.006 y 5.007 de la Ley Electoral de Puerto Rico, el Gobernador convocará a todos los electores sin establecer ninguna limitación en la participación de los electores debidamente cualificados como tales.

"POR CUANTO: El Hon. Carlos Romero Barceló, Gobernador de Puerto Rico, en armonía con lo dispuesto por la Ley Electoral de P.R., solicitó a la Comisión Estatal de Elecciones, asesoramiento pertinente en cuanto a la fecha para celebrar la Elección Especial, así como cualquier otra información técnica de naturaleza electoral relacionada con la misma.

"POR CUANTO: La Elección Especial para cubrir dicho escaño vacante

vacante. El 3 de marzo de 1981, el Partido Popular Democrático presentó ante el Tribunal Superior una acción de sentencia declaratoria e interdicto, impugnando los términos de la referida Convocatoria. Sostiene el P.P.D. que en la elección especial sólo podrían participar como candidatos y votar los afiliados al P.P.D. Diez electores del Distrito Representativo Núm. 31, no afiliados al P.P.D., solicitaron intervención oponiéndose a las contenciones del demandante. Se permitió la intervención. El caso quedó sometido a base de prueba documental.

■ El 6 de marzo de 1981 el Tribunal Superior dictó sentencia, declarando con lugar la demanda. En síntesis, ordenó al Hon. Gobernador y al Administrador General de Elecciones tomar las medidas pertinentes para que en la elección especial sólo participen candidatos y electores afiliados al P.P.D. El 24 de marzo de 1981 los electores interventores presentaron un escrito de apelación, mientras que el señor Gobernador presentó un recurso de revisión contra la referida sentencia. Ambos recursos sostienen que es errónea la sentencia del Tribunal Superior al interpretar las disposiciones pertinentes de la Ley Electoral en forma incorrecta y en violación de los derechos constitucionales de los electores del Distrito Representativo 31. La súplica, en ambos recursos, es al efecto de que se revoque la sentencia y se determine que en la elección especial tienen derecho a votar todos los electores de la demarca-

deberá llevarse a cabo no más tarde de los noventa (90) días siguientes a la fecha de su convocatoria y la persona que resulte electa en la misma ocupará el cargo hasta la expiración del término de su antecesor.

"POR CUANTO: En Reunión Extraordinaria celebrada el viernes 20 de febrero, la Comisión acordó fijar la fecha para la Elección Especial del Distrito Representativo Número 31, el 24 de mayo de 1981.

"POR TANTO: Yo, Carlos Romero Barceló, Gobernador del Estado Libre Asociado de P.R., conforme a la facultad que me confiere la Constitución y la Ley Electoral de P.R., por la presente convoco a una Elección Especial en el Distrito Representativo Número 31, para elegir al Representante de dicho Distrito, compuesto por el Precinto de Caguas 86, entre todos los electores de la demarcación geográfica comprendida en el precinto de Caguas 86, el domingo 24 de mayo de 1981."

ción geográfica correspondiente al Distrito Representativo número 31 y que pueden participar candidatos independientes. En virtud de la vigencia inmediata de la sentencia dictada por el Tribunal Superior, ver *Peña* v. *Federación de Esgrima de P.R.*, 108 D.P.R. 147 (1978), recurrente y apelantes presentaron ante este Tribunal mociones en auxilio de jurisdicción. El 26 de marzo de 1981 expedimos el auto de revisión. Consolidamos ambos recursos. Concedimos a las partes término simultáneo hasta el 10 de abril de 1981 para someter sus respectivos alegatos. El 27 de marzo de 1981, en auxilio de nuestra jurisdicción, suspendimos los efectos de la sentencia recurrida y paralizamos los términos establecidos en el Art. 5.006 de la Ley Electoral. Toda vez que se trata de un recurso de sentencia declaratoria, nuestra función es determinar el alcance e interpretación del estatuto.

¿Cómo se cubre la vacante de un Representante por Distrito según los dispuesto en los Arts. 5.006 y 5.007 de la Ley Electoral? El estatuto es, por demás, confuso; buen ejemplo de una desafortunada redacción. Es nuestro deber, sin embargo, llenar las lagunas que hubiese y armonizar aquellas disposiciones que estén o parezcan estar en conflicto. Art. 7, Código Civil, 31 L.P.R.A. sec. 7.

De acuerdo con las disposiciones estatutarias que aquí consideramos, cuando ocurre una vacante en un cargo de Representante por un distrito, nominado por un partido antes de los quince meses precedentes a la fecha de la próxima elección general, el Gobernador convocará, previa consulta con la Comisión Estatal de Elecciones, a una elección especial en el distrito afectado por la vacante surgida.

El referido Art. 5.006 muestra con inconfundible relieve como propósito esencial el de proveer manera para que el partido que vaca un escaño en el Senado o en la Cámara por muerte o renuncia del incumbente, o por cualquier otra causa, pueda restablecer el balance de

poder legislativo, sustituyéndolo con uno de sus miembros *bona fide*. Que la premisa dominante en dicho artículo es la sustitución del incumbente original por otro miembro del mismo partido político que lo eligió, se desprende del texto del segundo párrafo de dicho artículo que concede una clara opción preferente "al *partido* al cual pertenecía el legislador del escaño vacante" para presentar una candidatura "para llenar el mismo", y solo por vía de excepción, si dicho partido no presenta una candidatura en término de 60 días, se admiten otros candidatos *independientes*. El propósito es mantener el balance de poder entre partidos bajo el cual se constituyó la Cámara, no es alterarlo ni modificarlo. Dejó bien claro el estatuto el derecho del partido político de preservar el escaño que ganó en la elección general, pues únicamente lo perdería por su propia desidia o manifiesta falta de interés, al dejar de presentar su propia candidatura para sustituir al legislador que ocasionó la vacante. Está preservada la autonomía del partido para cubrir el escaño vacante. Cuando el partido, siguiendo un procedimiento de debido proceso e igual protección de los derechos de sus electores aspirantes a la nominación, logra seleccionar un candidato, se ha cumplido la alternativa de prioridad del Art. 5.006 y a todas luces resulta innecesario recurrir a la *segunda alternativa* de elección especial. Si, por el contrario, el partido al cual pertenecía el legislador que ocasionó la vacante somete a la Comisión Estatal de Elecciones más de un candidato para cubrirla, dentro del plazo de sesenta días establecido en la ley, o expira ese plazo sin que se le someta candidato alguno, entonces procede la convocatoria a una elección especial en la cual votarán "todos los electores de la demarcación geográfica en que la misma debe celebrarse, con derecho a ello . . .". Esta disposición limita la participación en la elección especial a electores del distrito en que exista la vacante. En el último supuesto, cuando el partido a que pertenecía el legislador que ocasionó la

vacante no somete candidatura alguna, es cuando única-
mente se admiten otros candidatos. Esto es consistente
con la clara intención del estatuto en distinguir el modo de
llenar la vacante de un legislador por distrito a base de si
la vacante ocurre o no dentro del período de los quince
meses anteriores a la celebración de la próxima elección
general. Si la vacante ocurre dentro de dicho período, no
se cubrirá en modo alguno mediante una elección especial,
sino en la misma forma en que fue seleccionado su antecesor.
Si la vacante ocurriera antes de dicho período de 15 meses,
la vacante se cubrirá de una de tres formas, a saber:
1) elección especial en la que pueden participar como candi-
datos personas de cualquier partido y candidatos indepen-
dientes —esto ocurre si el partido no presenta candidatura
alguna dentro del período de 60 días, 2) elección especial
en la que solo participan como candidatos los afiliados al
partido del legislador que provocó la vacante —esto ocurre
si dentro de dicho período el partido presenta una
candidatura de más de un candidato, 3) sin elección
especial —esto ocurre cuando el partido, dentro del
período de 60 días, presenta una candidatura de un solo
candidato. En tal caso éste queda automáticamente electo
para cubrir la vacante.

Es solo previendo la posibilidad de que el partido
afectado por la vacante no presente una candidatura
dentro de los 60 días de ocurrida, que la Ley provee la
elección especial como método supletorio. La convocatoria
a elección por el Gobernador y la disposición aislada del
Art. 5.007 en que se definen como personas con derecho a
votar "todos los electores de la demarcación geográfica" no
son más que un procedimiento en reserva, que se activa
sólo cuando no se produce la preferente propuesta del
partido para llenar la vacante. Está preservada la auto-
nomía del partido para seleccionar, por los medios pro-
vistos en sus reglas internas, el candidato que habrá de
presentar para cubrir el escaño vacante. Cuando el

partido, siguiendo un procedimiento de debido proceso e igual protección de los derechos de sus electores aspirantes a la nominación, logra seleccionar un candidato, se ha cumplido la alternativa de prioridad del Art. 5.006 y evidentemente resulta innecesario recurrir a la segunda alternativa de elección especial.

■ Bien ocurra la vacante *antes de* o *dentro de* los 15 meses precedentes a la fecha de la próxima elección general, la Ley ha diseñado el procedimiento como exclusivamente de *sustitución* del legislador por el partido que ganó su escaño en los comicios generales, quitándole toda intención de cambiar la composición del cuerpo legislativo determinado en dichas elecciones generales.

■ El historial legislativo sostiene sustancialmente esta interpretación. Surge de un diálogo entre el Senador Cancel Ríos y el Senador Oreste Ramos con relación al asunto que nos ocupa y que se copia al calce,(3) que la

---

(3) A continuación transcribimos el diálogo:

"SR. CANCEL RÍOS: Hay un evidente conflicto, compañero, porque el texto ante nuestra consideración le está dando un tratamiento al legislador independiente igual que a los Representantes por Acumulación y todavía más, de acuerdo con el texto vamos a cambiar la naturaleza misma del escaño legislativo al convertirlo en independiente que eso no lo dice la Constitución. En la página 110 del proyecto dice: 'Si dentro de los 60 días siguientes a la fecha de la vacante el partido al cual pertenecía el legislador del escaño vacante no presentara una candidatura y aquí son los legisladores por Distrito. Para llenar el mismo se considerará el escaño como si fuera un legislador independiente a los fines de la celebración de la elección especial para llenarlo. Eso no lo dice la Constitución.'

"SR. ORESTE RAMOS: El compañero a lo que se refiere es entonces que el hecho de incluir dentro de la disposición que se propone a un Senador o Representante electo independientemente, cosa que no dice la Constitución, eso constituye una violación de la Constitución.

"SR. CANCEL RÍOS: Entendemos que sí. Y entendemos además, que hay una confusión de los términos cuando se habla de 30 y 60 días.

"SR. ORESTE RAMOS: Pero el compañero . . . Es que no entendemos bien la posición del compañero. O sea, a lo que se refiere el compañero es que la Constitución no dice nada sobre los Senadores o Representantes electos independientemente. O sea, hay un vacío en la Constitución con relación a las personas electas independientemente. La legislación estaría llenando ese vacío en cuanto a los Senadores y Representantes electos independientemente. Entiendo bien la posición del compañero, si la entiendo en el sentido de que el llenar ese vacío constituiría una violación de la Constitución.

"SR. CANCEL RÍOS: No, no, no es asunto de llenar vacío distinguido

vacante pertenece al partido del legislador que la provocó. La interpretación también es consistente con la que hizo el propio Gobernador y la Comisión Estatal de Elecciones al surgir la vacante en el Distrito Representativo número 40 en el año 1979. En efecto, la primera vacante de un escaño

compañero, es cambiar la naturaleza de un cargo. A base de la disposición de esta ley un cargo de Representante por Distrito o Senador por Distrito si el partido no lo pudiera llenar en 30 días por disposición, esta ley se convierte en un candidato independiente y eso no lo dice la Constitución.

"SR. ORESTE RAMOS: Permítame el compañero, no es que se convierte en un candidato independiente, sino que se le dará el tratamiento que se le daría a un candidato independiente. Estamos contestes en eso.

"SR. CANCEL RÍOS: Claro, lo convierte.

"SR. ORESTE RAMOS: Y ese tratamiento, ¿sería igual?

"SR. CANCEL RÍOS: ¿Un tratamiento independiente?

"SR. ORESTE RAMOS: Sí.

"SR. CANCEL RÍOS: Igual que los Senadores y Representantes por Acumulación que los vota todo el país.

"SR. ORESTE RAMOS: No, no pero perdóneme. ¿Se llenaría la vacante de ese Senador o Representante si no se llena en el término de legislación que se llene en el caso de los independientes?

"SR. CANCEL RÍOS: No, no pero compañero, la legislación . . . La Constitución no dice eso.

"SR. ORESTE RAMOS: Ya lo sé, compañero, pero para ir puntualizando. El producto neto de la argumentación del compañero con relación al texto del proyecto es el de que si no se llena dentro del término de 30 días la vacante se consideraría entonces a ese Senador o Representante como si fuera candidato independiente. Lo que quiere decir eso en término neto es que se llenaría esa vacante de la misma manera como dispone el proyecto que se llene la de un candidato independiente que fue electo.

"SR. CANCEL RÍOS: No, compañero, no es así. Un partido que elige un candidato por distrito a la Cámara o al Senado, es un Senador o un Representante por Distrito que pertenece a ese partido y lo que está buscando este proyecto, lo que pretende este proyecto, que ese candidato, ese representante, no candidato, o senador que fue electo en unas elecciones y que pertenece a determinado partido, por disposición de esta ley si en treinta días no se llena la vacante le convierte el escaño en una de naturaleza independiente que la Constitución le da un tratamiento distinto.

"SR. RAMOS, ORESTE: ¿Y qué tratamiento le da la Constitución a los independientes?

"SR. CANCEL RÍOS: Yo se lo leí, compañero.

"SR. RAMOS, ORESTE: No, porque yo entendía que el compañero lo que me dijo . . .

"SR. CANCEL RÍOS: Le da . . .

"SR. RAMOS, ORESTE: Que no le daba ninguno.

"SR. CANCEL RÍOS: No, no le da un tratamiento.

"SR. RAMOS, ORESTE: ¿A los independientes?

"SR. CANCEL RÍOS: A los independientes. De hecho, por eso es que la ley

de un Representante por Distrito, bajo la ley vigente, surge el 21 de junio de 1979 al renunciar el representante Alejandro Cruz Ortiz, del *P.N.P.*, a su escaño correspondiente al Distrito Representativo número 40. El 20 de julio de 1979 el Hon. Gobernador emitió una Proclama convo-

vigente separa las disposiciones que tienen que ver con los candidatos independientes.y lo que tiene que ver con candidatos por acumulación.

"SR. RAMOS, ORESTE: Sí, compañero. Yo lo que quisiera es que el compañero me dijera ¿porque el considerar el escaño si no se llena dentro del término, considerar el escaño como un escaño para el cual fue electo un candidato independiente produce en términos netos una manera de sustituir distinta que la que se le daría si no hubiese sido un candidato independiente?

"SR. CANCEL RÍOS: Compañero, lo que le estoy diciendo, distinguido compañero, que la disposición de la ley cambia la naturaleza de un escaño y no lo puede hacer.

"SR. RAMOS, ORESTE: ¿Pero el escaño se queda vacío en ambos casos?

"SR. CANCEL RÍOS: Se queda vacío . . . pero es que dispone de treinta días para convertir . . . un escaño, que pertenece a un partido, y le da solamente treinta días si el partido dentro de sus procesos internos, como en el caso nuestro, antes de la ley dispone para llenar ese cargo a través de unas primarias y solamente se le da treinta días para instrumentar unas primarias, y si el propio Tribunal Electoral ahora, o lo que ustedes pretenden cristalizar, no puede en treinta días instrumentar el proceso, de esas primarias, de acuerdo con la disposición de esta ley, convierte un cargo que le pertenece al partido que lo ganó en unas elecciones, lo convierte en un cargo independiente que podría postularse cualquiera y podrían todos los partidos participar en ese proceso.

"SR. RAMOS, ORESTE: ¿Después de los treinta días?

"SR. CANCEL RÍOS: Después de los treinta días.

"SR. RAMOS, ORESTE: ¿Podría postularse cualquiera?

"SR. CANCEL RÍOS: A base de lo que dispone esto aquí, sí.

"SR. RAMOS, ORESTE: O sea, que habría una elección después de los treinta días.

"SR. CANCEL RÍOS: A base de lo que dispone esto, sí, es así.

"SR. RAMOS, ORESTE: Se lo pregunto, compañero, porque específicamente nos interesaba ver la parte de la legislación propuesta a la cual el compañero se refiere para decirnos que en ese caso habría una elección y que podría correr cualquier persona.

"SR. CANCEL RÍOS: Así es.

"SR. RAMOS, ORESTE: ¿Entonces no se queda vacío?

"SR. CANCEL RÍOS: Bueno, no se queda vacío, lo que pasa que pueden otras personas, que no tienen derecho, ocupar el cargo que le pertenece a un partido que lo ganó en unas elecciones.

"SR. RAMOS, ORESTE: ¿Qué el partido lo dejó vacío?

"SR. CANCEL RÍOS: Que lo dejó vacío porque no ha podido llenarlo. Vamos a suponer que el partido en treinta días no puede instrumentar unas primarias. Vamos a suponer que el adefecio este que se piensa crear ahí, no pueda celebrar las primarias en el tiempo de treinta días, pues, de acuerdo con esta ley, ejemplo, el caso de Arecibo, pues el Senador electo por ese distrito o el

cando a una "elección de primarias" entre candidatos y votantes afiliados al *P.N.P.* Entendió el Gobernador que si se presentaban candidatos de dicho partido, la elección especial sería, en rigor, una primaria. Igualmente entendió

---

Representante, uno de los Representantes electos por ese Distrito por mayoría en las elecciones precedentes, pues ese escaño no es de ese partido, ese escaño entonces, va a ser parte de una contienda de candidatos independientes y candidatos de todos los partidos.

"SR. RAMOS, ORESTE: ¿Y cómo se llena, cómo entiende el compañero que se llenaría de acuerdo con la legislación propuesta pasados los treinta días?

"SR. CANCEL RÍOS: De acuerdo con esto, esos cargos pertenecen al partido.

"SR. RAMOS, ORESTE: No, no, perdóneme, compañero. De acuerdo con la legislación propuesta, ¿cómo entiende el compañero que se llenaría ese escaño después de los treinta días?

"SR. CANCEL RÍOS: Si es de un . . . de acuerdo con la Constitución . . .

"SR. RAMOS, ORESTE: No, no perdóneme, compañero, de acuerdo con la legislación.

"SR. CANCEL RÍOS: No, de acuerdo con la Constitución, que es lo que vale. Eso es lo que yo le estoy hablando al compañero, es de acuerdo con la Constitución. Si un cargo de un legislador, si una persona ocupa un cargo como legislador independiente con eso no hay problema, porque él salió independiente y si surge una vacante, pues todo el mundo tiene derecho y por eso es que la Constitución y la ley sabía, que tenemos actualmente, que es una ley especial, le da unos tratamientos distintos a los legisladores por acumulación, a los legisladores que ocupan un cargo a nombre y en representación de un partido y el efecto real de esta disposición es que si ese partido no puede instrumentar en treinta días sus primarias internas a base del derecho que tienen los electores dentro de un partido, pues sencillamente ese partido que ganó en las elecciones ese escaño, pues está expuesto a perderlo frente a otro partido o frente a otro candidato independiente.

"SR. RAMOS, ORESTE: Compañero, la pregunta es, ¿cómo entiende el compañero que se llenaría ese escaño que no se llenó dentro de los treinta días en caso de que no se haya llenado dentro de los treinta días?

"SR. CANCEL RÍOS: Como dice la ley actualmente.

"SR. RAMOS, ORESTE: No, según la legislación propuesta, compañero.

"SR. CANCEL RÍOS: No según la legislación propuesta. Mire, compañero, es que yo se lo estoy advirtiendo desde el principio es que el articulado han hecho una confusión de los términos que corresponden a los legisladores por acumulación, el término que corresponde a un legislador independiente y el término que corresponde a un legislador que ha sido electo por un distrito.

"SR. RAMOS, ORESTE: Pero la pregunta es, compañero, ¿cómo entiende el compañero que llenaría el cargo de aprobarse el artículo propuesto, como está propuesto, como está propuesto pasados los treinta días sin que se haya llenado de la forma como se dispone para esos treinta días?

"SR. CANCEL RÍOS: Si un legislador de distrito, pues, sencillamente lo llenarían con un legislador independiente.

"SR. RAMOS, ORESTE: ¿Pero eso lo dice ahí?

"SR. CANCEL RÍOS: ¡Oh, sí; eso es lo que dice."

la Comisión Estatal de Elecciones cuando, al presentarse un solo candidato, el Secretario Estatal de Elecciones certificó que "existiendo un solo aspirante al escaño vacante antes señalado respetuosamente recomendamos al Administrador General de Elecciones que certifique al señor Salomón Rondón Tollen, como Representante por el Distrito Representativo número 40". La Comisión adoptó la opinión oficial del asesor legal del Administrador, en un memorando del 5 de octubre de 1979 en el cual se expresó que: "El derecho no puede pretender absurdos y la lógica nos dice que solo votarán en dicha elección especial los miembros del partido a que pertenecía el legislador cuya vacante ocasiona la celebración de dicha elección especial, sobre todo cuando el partido al cual pertenecía el candidato propuso dentro del término dispuesto por el propio artículo, candidatos pertenecientes a dicho partido."(4)

---

(4) El memorando del Lcdo. Pagán lee en lo pertinente:

"1. El historial político de los partidos en Puerto Rico de no inmiscuirse en los asuntos internos de los demás partidos políticos.

"2. La Ley no dispone taxativamente que debe contener la convocatoria del Gobernador y no impone restricciones o prohibiciones expresas de que no podrá citarse solo a los del partido, por el contrario deja la puerta abierta a que se limite por convocatoria a los del partido concernido o correspondiente. Cualquier conducta no expresamente prohibida por ley es permitida. Este es un principio general del derecho.

"3. La intención legislativa según se desprende de la lectura total del Artículo 5.006 es que solo voten los afiliados del partido a que pertenecían el anterior incumbente y el cual se encuentra vacante. El propio artículo deja abierta la posibilidad de candidatura independiente dentro de un período dispuesto por el propio artículo.

"4. El derecho no puede pretender absurdos y la lógica nos dice que solo votarán en dicha elección especial los miembros del partido a que pertenecía el legislador cuya vacante ocasiona la celebración de dicha elección especial, sobre todo cuando el partido al cual pertenecía el candidato propuso dentro del término dispuesto por el propio artículo candidatos pertenecientes a dicho partido.

"5. La Convocatoria del Gobernador es a una primaria y así fue informado el pueblo.

"6. El pueblo, los electores le han llamado tradicionalmente a estas elecciones especiales con el nombre de primarias y tradicionalmente los electores han interpretado que solo pueden votar en las mismas los afiliados del partido al que. pertenecía el legislador cuya vacante ocasiona la celebración de dicha elección especial. En nuestro sistema democrático de gobierno el principio rector

El recurrente nos exhorta a interpretar el estatuto en el sentido de que la consecuencia de que el partido presente la candidatura dentro del término indicado es que solo ese partido, como partido, tiene derecho a someter candidaturas, sin perjuicio de que se presente candidatos independientes a la elección especial. Si el partido no presentare la candidatura dentro del término, entonces, sostienen los recurrentes, todos los partidos pueden presentar candidaturas. Esta interpretación equivale a sostener que la presentación de la candidatura dentro del término indicado, solo tiene consecuencia con relación a si otros partidos pueden presentar candidatura, pero no afecta el derecho de candidatos independientes a presentarse en la elección. Tal interpretación es insostenible. Ni la letra ni el propósito que inspiró su aprobación, como lo indica el referido diálogo entre los senadores Ramos y Cancel Ríos, sostienen esa interpretación.

Queda por resolver la validez constitucional de la forma de cubrir la vacante que nos ocupa, a la luz de la interpretación de los estatutos considerados.

■ Se invoca la igual protección de las leyes y el derecho al voto. En cuanto al derecho al sufragio, el razonamiento de los recurrentes-apelantes es especioso.

---

de gobierno es la voluntad popular. La voluntad popular podría frustrarse de interpretarse de modo diferente lo aquí interpretado.

"7. Aparentemente se trata de un lapsus en la redacción del Artículo 5.007 y parece contrario a la intención legislativa del Artículo 5.006 de la vigente Ley Electoral. También sería contrario a lo dispuesto en el Artículo 1.002 que dispone lo siguiente:

'Por ello nuestro Ordenamiento Constitucional extiende además a los partidos políticos un reconocimiento expreso y unos derechos categóricos...'

"8. El hecho de que si la vacante ocurriese 15 meses de la celebración de una elección general, no sería necesaria la celebración de una elección especial. De ser tan crucial el asunto el legislador hubiera provisto para que se celebraran siempre dichas elecciones especiales.

"A tenor con lo antes expuesto recomiendo que el Proyecto de Reglamento de Elecciones Especiales se enmiende la Regla Número 1 consistente dicha enmienda en añadir la siguiente frase al final de la oración de la Regla:

'Y que sean afiliados al Partido al cual pertenecía el Legislador cuya vacante ocasiona la celebración de la elección especial.'"

Nos explicamos. Se reclama el derecho a votar en la elección para cubrir la vacante, a base de la interpretación de un estatuto; por otro lado, se sostiene esa interpretación del estatuto a base del derecho al voto. Para romper ese razonamiento circular habría que establecer, previamente, la exigencia constitucional de celebrar una elección para cubrir la vacante y el derecho a votar en esa elección. Pero la Constitución no exige determinado modo de llenar la vacante.[5] Justamente, la enmienda a la Sec. 8 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico, en noviembre de 1964, tuvo el efecto de dejar en manos de la Asamblea Legislativa el modo de llenar las vacantes. No puede, pues, invocarse el derecho constitucional al sufragio para forzar determinada interpretación de un estatuto que regula la manera de llenar una vacante legislativa, cuando la propia Constitución dejó el asunto en manos de la Asamblea Legislativa. Por las mismas razones, no puede invocarse tampoco la norma de que cuando un estatuto es susceptible de dos interpretaciones, una de las cuales es inconstitucional, pero no la otra, los tribunales adoptarán la interpretación que supera el problema constitucional. Aquí se trata de un estatuto confuso, susceptible de varias interpretaciones, pero todas ellas constitucionalmente válidas. Por eso, nuestra función se limita a hallar la verdadera intención del legislador.

■ Por último, el método elegido por el legislador no adolece de defecto alguno con relación a la igual protección de las leyes. La exclusión de candidatos de otros partidos y candidatos independientes no viola la garantía constitucional de la igual protección de las leyes. Aun presumiendo que sea de aplicación el criterio judicial del escrutinio estricto, existen intereses apremiantes de alta jerarquía

[5] La Constitución de los Estados Unidos tampoco exige un determinado modo de llenar las vacantes. Como se advierte y se explica en la opinión del Tribunal Superior —a la pág. 27— algunos Estados en su Constitución reconocen que el escaño pertenece al partido, otros adoptan el sistema de elección, mientras otros dejan el asunto a discreción de la Asamblea Legislativa.

para que el legislador considere que el escaño vacante pertenece al partido que nominó al legislador. Entre tales intereses apremiantes se destacan los siguientes: que no ocurran cambios en el balance legislativo hasta la celebración de la próxima elección general; la estabilidad de las estructuras de gobierno; la protección del mandato electoral, resultado de la última elección general; la reducción de las campañas políticas interpartidistas a una vez cada cuatro años.

■ Concluimos, pues, que los Arts. 5.006 y 5.007 de la Ley Electoral, con relación a cómo cubrir una vacante de un legislador por distrito —según los hemos interpretado— no adolecen de vicio constitucional alguno, bajo la Constitución del Estado Libre Asociado de Puerto Rico ni bajo la Constitución de los Estados Unidos de América.

■ La convocatoria emitida por el señor Gobernador el 26 de febrero de 1981 alteró todos los términos dispuestos en el Art. 5.006 de la Ley Electoral. Aún antes de considerar la interpretación correcta del estatuto, paralizamos dichos términos en auxilio de nuestra jurisdicción. Habiendo transcurrido ya más de cien días de surgir la vacante en el Distrito Representativo número 31, en equidad debemos disponer unos términos razonables análogos a los establecidos en el estatuto, pero reducidos a la mitad, en vista del tiempo transcurrido. Utilizaremos como término clave la notificación de esta Sentencia. A partir de tal notificación, el Partido Popular Democrático tendrá un término de 30 días para presentar a la Comisión Estatal de Elecciones una candidatura para llenar la vacante. Si tal candidatura se limita a un solo candidato, el Administrador deberá declarar a éste con derecho a ocupar el escaño vacante. Si la candidatura contiene más de un candidato, el señor Gobernador, dentro del término de quince días a la presentación de la candidatura, deberá convocar a una elección especial en la que solo podrán participar como candidatos las personas señaladas en la

candidatura del Partido Popular Democrático, sin participación de candidatos de otros partidos, ni de candidatos independientes. Si el Partido Popular Democrático no presentara candidatura alguna dentro·del referido término de 30 días, el señor Gobernador, dentro de los próximos 15 días a partir de expirado el término, convocará a una elección especial en la que podrán presentarse como candidatos personas afiliadas a cualquier partido o candidatos independientes que reúnan los requisitos del cargo. De haber elección especial, podrán votar todos los electores cualificados del Distrito número 31. La elección especial se celebrará dentro del término de 45 días a partir de la convocatoria emitida por el señor Gobernador.

*Se dictará sentencia de conformidad.*

### SENTENCIA

Conforme los fundamentos de la anterior opinión *per curiam,* se dicta sentencia a los fines de modificar la sentencia apelada, para declarar que, a partir de la notificación de esta sentencia, el apelado y recurrido tendrá un término de treinta días para presentar a la Comisión Estatal de Elecciones una candidatura para llenar la vacante en el Distrito Representativo número 31. Si tal candidatura se limita a un solo candidato, éste deberá ser certificado por el Administrador General de Elecciones como la persona con derecho a ocupar el escaño vacante. Si la candidatura incluyera más de un candidato, el señor Gobernador, dentro del término de 15 días de la presentación de tal candidatura, deberá convocar a una elección especial en la que solo podrán participar como candidatos las personas señaladas en dicha candidatura, sin participación de candidatos de otros partidos ni de candidatos independientes. Si el apelado y recurrido no presentara candidatura alguna dentro del referido término de 30 días, el señor Gobernador, dentro de los próximos 15 días a partir de expirado el término, convocará a una elección especial en la que podrán presentarse como

candidatos personas afiliadas a cualquier partido o candidatos independientes que reúnan los requisitos del cargo. De haber elección especial, podrán votar todos los electores cualificados del Distrito Representativo número 31. La elección especial deberá celebrarse dentro del término de 45 días a partir de la convocatoria emitida por el señor Gobernador.

Así lo pronunció y manda el Tribunal y certifica el Secretario. El Juez Asociado Señor Rigau está conforme con la opinión del Tribunal, pero se reserva el derecho de expresarse, si lo considerase necesario, ya que él estima que, como se trata de sustituir a un representante ya electo que falleció, tanto la candidatura como los votantes deben ser miembros *bona fide* del partido a que pertenecía el representante fallecido. El Juez Asociado Señor Irizarry Yunqué está conforme con la opinión, salvo que en voto separado consigna su criterio en cuanto a que solo pueden participar en la elección especial los electores del partido a que pertenecía el escaño vacante. El Juez Asociado Señor Dávila emitió voto separado en el que concurre en parte con la opinión del Tribunal. El Juez Asociado Señor Martín emitió opinión disidente. El Juez Asociado Señor Negrón García emitió opinión disidente a la que se une el Juez Asociado Señor Martín.

(Fdo.) Ernesto L. Chiesa
*Secretario*

—O—

Voto separado del Juez Asociado Señor Dávila.

San Juan, Puerto Rico, a 8 de mayo de 1981

Estoy de acuerdo con la interpretación que el Tribunal hace del Art. 5.006 de la Ley Electoral, con una aclaración. Si hay más de un aspirante *bona fide* al escaño vacante, el partido concernido no puede evitar que se celebre la elección especial dispuesta en el estatuto, celebrando una primaria interna en la que solo participen

los afiliados a ese partido. Si eso se permitiera, frustraría lo dispuesto en la ley, al efecto de que debe celebrarse una elección especial para escoger el sustituto. Como en el presente caso es de conocimiento judicial que hay más de un aspirante al escaño vacante, es necesaria la celebración de la elección especial en la que participen todos los electores del distrito con derecho a ello.

—O—

Voto particular del Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 8 de mayo de 1981

No puedo suscribir aquella parte de la opinión del Tribunal, que permite que, en una elección especial para nominar a quien ha de cubrir una vacante por un partido político, participen electores no afiliados a ese partido. En mi opinión, no puede derivarse tal interpretación de los Arts. 5.006 y 5.007 de la Ley Electoral, 16 L.P.R.A. secs. 3206 y 3207, respectivamente, ni hay base para siquiera concebir que ello estuviera en la mente del legislador al redactar dichos artículos. De hecho, esa no fue la interpretación adoptada por la Comisión Estatal de Elecciones, organismo administrativo cuya interpretación de la Ley Electoral debe merecernos gran deferencia por ser el que directamente viene obligado a cumplimentarla, al disponer para llenar la vacante ocurrida en el Distrito Representativo número 40 en el 1979. Expresó con sobrada lógica el asesor legal de la Comisión, en opinión que dicho organismo adoptó: "El derecho no puede pretender absurdos y la lógica nos dice que solo votarán en dicha elección especial los miembros del partido a que pertenecía el legislador cuya vacante ocasiona la celebración de dicha elección especial, sobre todo cuando el partido al cual pertenecía el candidato propuso dentro del término dispuesto por el propio artículo, candidatos pertenecientes a dicho partido."

Convengo en que la redacción de los referidos artículos es confusa. Es nuestro deber interpretarlos, armonizando sus disposiciones —Art. 7 del Código Civil, 31 L.P.R.A. sec. 7— para llegar a soluciones lógicas. Al hacerlo, debemos tener presente la realidad histórica de que se ha respetado siempre el principio de que los escaños legislativos, salvo cuando se trate de legisladores elegidos como candidatos independientes, pertenecen a los partidos políticos. Como señaló el asesor legal de la Comisión Estatal de Elecciones en su memorando de 5 de octubre de 1979, adoptado como la opinión de la Comisión, es factor determinante de esta interpretación "[el] historial político de los partidos en Puerto Rico de no inmiscuirse en los asuntos internos de los demás partidos políticos". Dicho memorando se transcribe *in extenso* en el escolio 4 de la opinión de este Tribunal, a que me remito.

A mi juicio la única interpretación lógica y jurídica de los citados Arts. 5.006 y 5.007([1]) es la siguiente, cuando se da la situación de este caso, es decir, cubrir la vacante en un escaño legislativo perteneciente a un partido político, ocurrida por muerte de un representante electo por un distrito representativo antes de los quince meses precedentes a la fecha de la próxima elección general: conforme al Art. 5.006, el partido debe "presenta[r] una candidatura" para llenar la vacante "dentro de los sesenta días siguientes" de haberse producido. Esa candidatura puede ser de un candidato, si el partido así lo decide mediante sus propios mecanismos internos, o el partido puede abrirse a una primaria, si tuviere más de un candidato aspirante a cubrir la vacante y desee que su elección se hiciera bajo la supervisión del organismo electoral del Estado, que es la Comisión Estatal de Elecciones. Si optare por lo primero, el candidato seleccionado será certificado para

---

([1]) Dichos artículos se transcriben en el escolio número uno de la opinión del Tribunal, y no se reproducen aquí para no ser repetitivos y en aras de economía.

cubrir la vacante, sin necesidad de celebrar elección especial alguna. Si optare por lo segundo, es decir, por la primaria, así lo notificará a la Comisión Estatal de Elecciones para que el señor Gobernador haga la correspondiente convocatoria a elección especial. Esto está acorde con la disposición del Art. 5.006 de que el Gobernador, "previa consulta con la Comisión", convocará a elección especial.

El Art. 5.007 (16 L.P.R.A. sec. 3207) dispone:

> Votarán en una elección especial todos los electores de la demarcación geográfica en que la misma deba celebrarse, *con derecho a ello* conforme la convocatoria al efecto emitida por el Gobernador de Puerto Rico. (Énfasis suplido.)

No puede interpretarse este artículo como confiriendo derecho a votar, en la elección especial convocada para elegir entre candidatos del partido a que pertenece el escaño, a todos los electores del distrito en que ocurre la vacante. Se convocará a los electores "con derecho a ello", es decir, con derecho a participar en dicha elección.

En el supuesto que estamos comentando, los electores "con derecho a ello" son lógicamente los afiliados *bona fide* al partido político a que pertenece el escaño. La elección especial a convocarse, en este supuesto, no es otra cosa que una primaria a celebrarse de conformidad con y en obediencia a las disposiciones de la Ley Electoral. Véanse los Arts. 4.001 a 4.029 (16 L.P.R.A. secs. 3151 a 3179). Nótese que el Art. 4.001 (16 L.P.R.A. sec. 3151), al enumerar los "principios esenciales de toda candidatura", especifica que "(c) [n]ingún partido político presentará más de un candidato para cada cargo ni más de una candidatura". Esta disposición es, a mi juicio, muy reveladora. Es obvio que un partido no postula más de un candidato para un cargo. Dentro del partido, muchos de sus miembros pueden ser candidatos a la nominación por el partido, pero solo uno será nominado por el partido.

Sería absurdo pensar que un partido esté dispuesto a dejar que los electores de los demás partidos decidan quién debe ser elegido para llenar la vacante. Esa posibilidad sería irreal. El hecho de que el estatuto sea confuso no puede justificar que se interprete para consagrar cosas absurdas.

Por último, debo señalar que no he pasado por alto la concurrencia de dos términos en el Art. 5.006, que podrían parecer contradictorios. Nuevamente, debe recordarse que es nuestra obligación armonizar las contradicciones, sean aparentes o reales. El citado artículo dice que "el Gobernador, previa consulta con la Comisión, convocará, dentro de los treinta (30) días siguientes a la fecha en que se produzca la vacante, para la celebración de una elección especial en el distrito afectado por la vacante surgida". Más adelante dice que "[s]i dentro de los sesenta días siguientes a la fecha de la vacante el partido al cual pertenecía el legislador del escaño vacante no presenta una candidatura para llenar el mismo, se considerará el escaño como si fuere el de un legislador independiente a los fines de la celebración de la elección especial para llenarlo".

Como hemos visto, la convocatoria puede resultar innecesaria si el partido opta por presentar un solo candidato. Así lo entiende este Tribunal en su opinión. Pero el partido tiene sesenta días para decidirse entre presentar un candidato o someterse a la elección especial, mientras que el Gobernador solo tiene treinta días para convocar a la elección, ambos plazos a contarse desde que se produce la vacante. ¿Quiere esto decir que el plazo de sesenta días, de hecho, queda acortado a treinta? Entiendo que no. A mi juicio, armonizando ambas disposiciones, lo que sucede es que, aunque el Gobernador tiene treinta días para convocar, su convocatoria puede resultar inoperante o puede ser modificada por la decisión que tome el partido en sesenta días. Sería inoperante si el partido presenta un

solo candidato para cubrir la vacante, y sería modificada para que se limite la convocatoria a los miembros afiliados al partido, si éste opta por someterse a una primaria o elección especial.([2])

Con las salvedades aquí expresadas, suscribo en lo demás la opinión de este Tribunal de la fecha de hoy.

—O—

Opinión disidente separada del Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 8 de mayo de 1981

Me preocupa sobremanera que el Tribunal haya forzado la interpretación del texto de la Ley Electoral —Art. 5.006— sobre lo que constituye una "elección especial", para concluir que puede obviarse dicha elección si el partido político al que pertenecía el representante de distrito que produjo la vacante presenta una "candidatura" limitada a *un* solo candidato. Ello a pesar de que el citado Art. 5.006 dispone específicamente que en los casos en que ocurriera una vacante *antes* de los quince meses precedentes a la fecha de la próxima elección general, el Gobernador *convocará* para la celebración de una *elección especial* en el distrito afectado por la vacante surgida. Solamente en el caso de vacantes ocurridas *dentro* de los quince meses precedentes a una elección general, la Ley autoriza al partido político al que perteneciera dicho representante de distrito a seleccionar *una* persona para cubrirla en la misma forma en que fue seleccionado su antecesor. Luego, me resisto a creer que un partido pueda hacer indirectamente lo que la Ley no autoriza directamente.

([2]) Los términos primaria y elección especial no son sinónimos, pero tampoco antagónicos, y, de hecho, pueden equivaler a lo mismo si el partido selecciona su candidato mediante el mecanismo de una primaria. Nótese que al definir el término "elecciones", la Ley Electoral indistintamente dice que "significará elecciones generales, *primarias*, referéndums, plebiscitos o *elecciones especiales*". Art. 1.003, inciso (14), 16 L.P.R.A. sec. 3003(14). (Bastardillas nuestras.)

Para llegar a la conclusión de que la "elección especial" puede obviarse, el Tribunal parte de la premisa, que considero errónea, de que la Sec. 5.006 establece dos alternativas: la primera, denominada por el Tribunal como de *prioridad*, que consiste en seleccionar *un* solo candidato; y la segunda, que consiste en la elección especial. Además de que dicha Sec. 5.006 no puede interpretarse como que ofrece ninguna prioridad, el Tribunal confunde los conceptos de "candidatura" y "candidato" que están claramente definidos en la Ley —Art. 1.003(5), (7)— y los considera como equivalentes. La opinión disidente del compañero Juez Negrón García deja palmariamente explicada la diferencia entre ambos términos.

La falla de la interpretación que hace el Tribunal para obviar la celebración de la elección especial queda aún más en descubierto si analizamos los términos que establece el Art. 5.006 para realizar la elección especial. La secuencia de los términos revela el propósito de la obligatoriedad de dicha elección. Primero, provee que el Gobernador *convocará* a la elección dentro de los treinta días siguientes a la vacante. Segundo, que el partido del legislador tiene sesenta días para presentar una candidatura. Tercero, que la elección *deberá* llevarse a cabo no más tarde de los noventa días siguientes a la convocatoria. Es fácil concluir de la letra de la Ley que el Gobernador *debe* convocar, que el partido tiene un término adicional para presentar la candidatura, y que la elección *deberá* llevarse a cabo. En vista de los términos absolutos en que se expresó el legislador, no era necesario disponer sobre el procedimiento a seguir de no celebrarse la elección. No puede, pues, inferirse que pueda prescindirse de dicha elección. Es claramente obligatoria.

Me preocupa aún más el pronunciamiento del Tribunal, que ordena por *fiat* judicial, como primera *prioridad*, la presentación por el Partido Popular Democrático de *un*

solo candidato, lo que obviaría la elección especial, puesto que ni siquiera dicho partido solicitó esa alternativa al incoar su sentencia declaratoria, en la que aceptó la celebración de la elección especial y suplicó que "en su consecuencia determine que en la *elección especial* que se celebre . . . sólo podrán participar candidatos y electores afiliados al Partido Popular Democrático . . . ". (Bastardillas nuestras.) Es evidente que dicho partido no cuestiona la obligatoriedad de la elección especial ni la participación exlusiva de *candidatos* afiliados al partido. La posibilidad de presentar un solo candidato no fue ni siquiera mencionada en la solicitud de sentencia declaratoria, a mi entender, por no surgir de la ley tal posibilidad bajo ninguna interpretación posible.

No puedo concebir cómo el Tribunal, que constituye el último reducto para salvaguardar los derechos ciudadanos, pueda negar, bajo la interpretación que hoy hace respecto a la eliminación de la elección especial, el derecho que la Ley concede a "todos los electores de la demarcación geográfica" correspondiente al distrito representativo en cuestión para participar en la elección especial dispuesta por el Art. 5.006. Ley Electoral, Art. 5.007. Tal derecho, una vez concedido, no puede ser negado sin que se infrinja el postulado constitucional que garantiza la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y que protege contra toda coacción en el ejercicio de la prerrogativa electoral. Constitución del Estado Libre Asociado, Art. II, Sec. 2. El pronunciamiento del Tribunal al efecto de que el partido al que pertenecía el incumbente del escaño vacado antes de los quince meses anteriores a la próxima elección general, puede impedir, mediante la presentación de un solo candidato, que se celebre la elección especial y así evitar que todos los electores de la demarcación geográfica participen en la elección del nuevo incumbente, equivale a interpretar que la Asamblea Legislativa delegó en dicho

partido la facultad de negar a los electores mencionados el derecho a la franquicia electoral, que expresamente les concedió la propia Ley Electoral. Art. 5.007.

Por las razones expuestas, disiento enérgicamente de la forzada interpretación que el Tribunal hace del Art. 5.006, en el que lee una intención legislativa de la cual no dejó rastro la Asamblea Legislativa.

—O—

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 8 de mayo de 1981

Es unánime el consenso entre los miembros del Tribunal de que el texto del Art. 5.006 de la Ley Electoral (1977), referente al método para llenar una vacante en el cargo de Senador o Representante por un Distrito, es en extremo ambiguo y confuso. Ineludible, pues, interpretarlo para lograr detectar y precisar el propósito y espíritu sumergido en sus palabras. Como ayuda extrínseca, el escaso historial legislativo evidenciado en el debate de dos senadores durante el trámite de su aprobación —citado *in extenso* en la opinión mayoritaria— en lugar de despejar dudas, crea mayores interrogantes. El interlocutor que lo originó citó erróneamente el texto primitivo que existía en la Constitución (1952), sin percatarse de que había sido enmendado en el año 1964. Su opositor no contribuyó a su elucidación, pues nunca aclaró esa equivocación. El inventario final parlamentario es un diálogo nebuloso, negativo a su investigación y esclarecimiento.[1]

---

[1] Ese debate comenzó así:

"SR. CANCEL RÍOS: Al distinguido letrado y distinguido compañero le voy a citar la Sección 8 de la Constitución del Estado Libre Asociado. 'El término del cargo de los Senadores y Representantes comenzará el día dos de enero inmediatamente siguiente a la fecha en que se celebre la elección general en la cual hayan sido electos. Cuando surja una vacante en el cargo de Senador o Representante por un distrito, antes de los quince meses inmediatamente precedentes a la fecha de la próxima elección general, el Gobernador convocará

La opinión del Tribunal intenta salvar esa incertidumbre reconociendo, en última instancia, en la prelación de valores constitucionales envueltos, jerarquía a los partidos políticos, por encima del derecho de los electores. Por nuestra parte, hemos tratado de superar esa oscuridad resolviendo, según preliminarmente expusiéramos el 27 de marzo, que el estatuto "constituye la fórmula conciliatoria y ecléctica concebida por nuestra Asamblea Legislativa de reconocer el derecho de todo elector —inclusive el de los interventores— de participar, a la par que el del partido político afectado, de retener, en primera oportunidad, la vacante y, por ende, la composición numérica inicial en la Legislatura conforme a los trascendentales principios constitucionales envueltos". *P.P.D.* v. *Gobernador*, 110 D.P.R. 783, 792 (1981). A tal efecto, dijimos que estamos ante una "elección especial [*sui generis*], según nuestra interpretación, *irrestricta en cuanto al electorado*, [que] tiene la

dentro de los treinta días siguientes a la fecha en que se produzca la vacante, a elección especial en dicho distrito, la cual habrá de celebrarse no más tarde de noventa días después de convocada, y la persona que resulte electa en dicha elección especial ocupará el cargo hasta la expiración del término de su antecesor. Cuando dicha vacante ocurriera en el transcurso de una sesión legislativa, o cuando la Asamblea Legislativa o el Senado fueren convocados para una fecha anterior a la certificación del resultado de la elección especial, el presidente de la cámara correspondiente nombrará a la persona recomendada por el organismo directivo central del partido a que pertenecía el Senador o Representante cuyo cargo quedó vacante, para que ocupe el cargo hasta que se certifique la elección del candidato que resulte electo. Cuando la vacante ocurra dentro de los quince meses anteriores a una elección general, o cuando ocurra en el cargo de un Senador o Representante por Acumulación, se cubrirá por el presidente de la cámara correspondiente, a propuesta del partido político a que pertenecía el Senador o Representante cuyo cargo estuviese vacante, con un candidato seleccionado en la misma forma en que lo fue su antecesor. La vacante de un cargo de Senador o Representante por Acumulación electo como candidato independiente se cubrirá por elección en todos los distritos'. Si verá el distinguido compañero la ley de 1965.

"SR. ORESTE RAMOS: Si me permite el compañero antes de entrar en la Ley de 1965 en este momento a mí lo que me interesa, naturalmente me interesa otro también. Pero primeramente quisiera que el compañero me aclarara el conflicto al cual él se ha referido como existente entre la disposición constitucional y el texto propuesto.

"SR. CANCEL RÍOS: Hay un evidente conflicto compañero . . . ." (Continúa el texto citado por el Tribunal.)

particularidad de que es para sustituir una vacante que pertenecía a un partido político, al cual la propia ley le confiere la facultad de presentar, en primer orden, *a sus candidatos* y de no hacerlo, abrir la contienda a otros partidos y electores. *Conceptualmente el Legislador ha podido mantener un balance entre los intereses democráticos en conflicto sin sacrificar la esencia de uno* ni del otro". (Bastardillas nuestras.) *P.P.D.* v. *Gobernador*, supra, pág. 791.

# I

Una ulterior reflexión nos mueve a reiterar ese primer enfoque como única alternativa jurídica viable a un decreto de inconstitucionalidad. Nuestra interpretación preliminar se basó en el siguiente análisis:

El primer párrafo [de la ley]: (a) establece la necesidad de una elección especial de surgir alguna vacante en el puesto de senador o representante por distrito nominado por un partido político; (b) cuando no procede elección alguna —quince meses antes de las próximas elecciones generales; y (c) contiene una serie de términos para que el Gobernador *convoque* y celebre la elección. Elección Especial no es sinónimo de primarias, pues el Art. 5.007 que le sigue visualiza que "[v]otarán en una elección especial todos los electores de la demarcación geográfica en que la misma deba celebrarse, con derecho a ello conforme la convocatoria al efecto emitida por el Gobernador de Puerto Rico". 16 L.P.R.A. sec. 3207. Resultaría un contrasentido que por un lado puedan participar todos los electores del distrito concernido, y que se estimara ello unas primarias, cuyo concepto requiere la participación exclusiva de los electores miembros de un partido en particular. Art. 1.003(37). (16 L.P.R.A. sec. 3003(37).)

En resumen, del primer párrafo se desprende que el Gobernador de Puerto Rico tiene un deber ministerial de convocar a una elección especial para cubrir las vacantes que surgen de los cuerpos legislativos, cuando dicha vacante es por un distrito representativo. Dicha convocatoria debe ser hecha dentro de los 30 días siguientes a la fecha en que se produzca la vacante. Por interacción de las definiciones

estatutarias, la convocatoria a elección especial excluye el concepto limitado de primarias; puede participar todo el electorado.

El segundo párrafo —que ha dado génesis a tantas dudas— reconoce el derecho de los partidos políticos que obtienen el triunfo en el distrito representativo del escaño vacado, a tener la oportunidad de llenarlo. A tal efecto, la ley requiere a ese partido que dentro de los sesenta días siguientes a la fecha de la vacante presente una "candidatura" para llenar el mismo. Varias observaciones despejan la incertidumbre. La palabra clave "candidatura", que según el Art. 1.003(7) de la Ley Electoral, 16 L.P.R.A. sec. 3003(7), se define como "el total de candidatos de un partido político que figuren en la papeleta electoral en la columna correspondiente a tal partido". Advertimos que el legislador acuñó un término preciso atado en su alcance a varios candidatos del partido político que ostentaba el escaño. Pudo muy bien referirse a "un candidato" pero no lo hizo, manifestando de ese modo una intención. Recuérdese que cuando hablamos de "elección", hay que presumir que son varios los candidatos; para poder elegir, tiene el elector que tener más de una opción. Este enfoque queda reforzado si examinamos este segundo párrafo reestructurando el deber impuesto de la forma negativa a una forma positiva:

"Si dentro de los sesenta días siguientes a la fecha de la vacante el partido al cual pertenecía el legislador del escaño vacante [no] presenta una candidatura para llenar el mismo, [no] se considerará el escaño como si fuere el de un legislador independiente a los fines de la celebración de la elección especial para llenarlo."

Forzoso es concluir que es el partido político afectado por la vacante quien tiene derecho a cubrirla mediante la *presentación de una candidatura* en tiempo. Presentada la misma, no cabe estimar que pueden nominarse otros candidatos desafiliados a ese partido para participar en la elección.

El párrafo tercero del estatuto nos explica llanamente las consecuencias de que el partido político al cual pertenecía el escaño no haya presentado una candidatura dentro de esos 60 días, y tiende a corroborar lo expuesto. A tal efecto, se considerará el escaño como si fuera [el de] un legislador independiente, en cuyo caso, "cualquier elector afiliado a un

partido político o persona debidamente cualificada como elector y que reúna los requisitos que el cargo en cuestión exige, *podrá presentarse como candidato en dicha elección"*. (Bastardillas nuestras.) *A contrario sensu,* de optar el partido político por presentar al electorado su candidatura, no podrán postularse otros electores afiliados a distintos partidos o independientes.

Finalmente, el cuarto párrafo cubre la situación cuando la vacante surge dentro de los 15 meses precedentes a una elección general, y establece que se cubrirá por el Presidente de la Cámara correspondiente, a propuesta del partido político a que pertenecía el que causa la vacante. Muy fácilmente se percibe la diferencia estatuida cuando la Asamblea Legislativa trató sobre una vacante antes de los quince meses precedentes a una elección general, como en el caso de autos, a cuando acontece dentro de los 15 meses precedentes a tal elección general. *Esta disimilitud nos da una fuerte base para sostener, como hemos concluido, la obligación del Gobernador de convocar a una elección especial en el Distrito Representativo Núm. 31 sin que pueda prescindirse de la misma mediante una nominación directa del partido envuelto, en que se somete un solo candidato.* (Bastardillas nuestras.) *P.P.D.* v. *Gobernador,* supra, págs. 789–791.

"Al leerse a la luz de su raigambre histórica",[2] comprendemos que el concepto de *elección especial* establecido en los Arts. 5.006 y 5.007 de la Ley Electoral vigente es un concepto familiar que se remonta y tiene origen constitucional en el Art. III, Sec. 8 de la Ley Fundamental, que exigía la celebración de ese evento para cubrir las vacantes al cargo de senador o representante por un distrito. Así permaneció hasta que fue enmendado en el año 1964. Tanto en aquel entonces como al presente, en su acepción, ese término está inexorablemente atado a la participación de todo un electorado. Contrario a lo resuelto por la ilustrada sala sentenciadora, no puede asimilarse ni igualarse a una primaria, cuya ejecución está limitada a que tomen parte solamente miembros

---

[2] *Municipio* v. *Fernós, Com.,* 63 D.P.R. 978, 983 (1944).

afiliados, *bona fide*, del partido político que las patrocina. Nótese que la ley establece y reconoce las diferencias semánticas y sustantivas entre "primarias" y "elecciones especiales". Ambas están comprendidas dentro del concepto genérico mayor, pero ciertamente no son la misma cosa. La presencia de variantes notables en propósitos, características y protagonistas movió al Legislador a conceptuarlas y tratarlas separadamente, de manera individual y diferente: "Elecciones" dijo, "significará elecciones generales, *primarias*, referéndums, plebiscitos o *elecciones especiales*". (Bastardillas nuestras.) Art. 1.003(14), 16 L.P.R.A. sec. 3003(14). El denominador común que las une a todas es la participación activa, total o parcial, del electorado en la votación, lo cual contrasta significativamente con el método de designación directa, sin elección.

Es principio de hermenéutica que, bajo pretexto de buscar la intención legislativa, un tribunal no está autorizado a adicionarle limitaciones o restricciones que no aparecen en un estatuto. *Román* v. *Superintendente de la Policía*, 93 D.P.R. 685 (1966). Por ello, no podemos menoscabar la intervención de todo el electorado del Distrito Representativo Núm. 31 poniendo énfasis en el Art. 5.007, que lee: "Votarán en una elección especial *todos los electores* de la demarcación geográfica en que la misma deba celebrarse, *con derecho a ello* conforme la convocatoria al efecto emitida por el Gobernador de Puerto Rico". (Bastardillas nuestras.) 16 L.P.R.A. sec. 3207. Los antecedentes de ese artículo derrotan tal contención. Ese lenguaje, salvo unas diferencias de estilo, recoge en esencia el texto que regía bajo la Sec. 2 de la Ley Núm. 20 de 22 de agosto de 1952, cuando prevalecía la disposición constitucional de "elección especial". Entonces rezaba:

Tendrán derecho a votar en tal elección [especial] *todos los electores que aparezcan en la lista de votantes usada en la elección general inmediatamente precedente en dicho distrito* o, en todo Puerto Rico, en el caso de que haya de cubrirse

una vacante de senador o de representante por acumulación electo como candidato independiente." 16 L.P.R.A. sec. 442. (Bastardillas nuestras.)

Repetimos; tanto en el pasado como en la actualidad, el término *elección especial* denota y refleja la celebración de unos comicios singulares a los cuales son acreedores a participar *todos* los electores. La frase "con derecho a ello conforme la convocatoria al efecto emitida por el Gobernador" no desnaturaliza el concepto. No puede argüirse que ello confiere facultad o discreción en el Primer Ejecutivo para limitar la intervención de ese electorado a un llamado exclusivo de afiliados a un solo partido. Tal propuesta acarrearía objeciones fundadas, de índole constitucional, en virtud de una delegación indebida del Poder Legislativo en el Poder Ejecutivo, carente de los parámetros necesarios según esbozados en el caso rector de *López* v. *Junta de Planificación*, 80 D.P.R. 646, 660 (1958) y reiterados en *Hernández Montero* v. *Cuevas, Director*, 88 D.P.R. 785 (1963). Precisamente, la ausencia en esta legislación de normas o guías claras ha dado margen a que el señor Gobernador, en dos convocatorias distintas, lo haya interpretado en forma completamente contradictoria e irreconciliable. Su intervención no puede extenderse más allá que el acto ministerial de simple ejecutor asignádole en la ley.

Respetuosamente discrepamos de la tesis mayoritaria del Tribunal, en el sentido de que la elección especial no es mandatoria, sino supletoria, que no es necesario celebrar si el partido político concernido propone un candidato dentro de 60 días. Otra vez, la evolución del estatuto nos impide suscribir tal interpretación. El lenguaje crucial en que se apuntala esa proposición es el que expone: "Si dentro de los sesenta días siguientes a la fecha de la vacante el partido al cual pertenecía el legislador del escaño vacante no presenta *una candidatura* para llenar el mismo, se considerará el escaño como si fuere el de un

legislador independiente a los fines de la celebración de la *elección especial* para llenarlo". (Bastardillas nuestras.)

Hemos argumentado que la palabra clave es "candidatura", la cual la Ley Electoral define como "el total de candidatos de un partido político que figuren en la papeleta electoral en la columna correspondiente a tal partido". El legislador acuñó y optó usar ese término preciso y específico, atado en su alcance a varios candidatos de un mismo partido político. Resulta, pues, que la definición estatutaria es compatible y congruente con el método diseñado y la mecánica de pluralidad de aspirantes de un sólo partido para la selección del escaño. No obstante, se descarta esa interpretación. El resultado neto es que el Tribunal sustituye hoy la palabra "candidatura" por "candidato", aun cuando hemos visto que esta última era un vocablo familiar a la Asamblea Legislativa, que estaba disponible y aparecía definido en la propia ley. Art. 1.003(7) y (5), respectivamente.

En un esfuerzo por descifrar esta confusa disposición de ley, nos hemos percatado que la misma contiene cierto lenguaje que guarda alguna semejanza con la mecánica que la Sec. 5 de la Ley Núm. 20, antes citada, derogada, tenía durante la vigencia del texto prístino constitucional. A tal efecto, en lo pertinente, leía:

> Cualquier partido político principal o cualquier partido por petición legalmente inscrito *podrá presentar un candidato para cubrir la vacante a que se refiere la elección especial mediante una convención debidamente convocada.* Dicha *convención* se celebrará a más tardar sesenta días antes de la elección y el presidente y secretario del organismo directivo central del partido político que presente el candidato deberá certificar su nombre al Secretario de Estado por los menos cincuenta y cinco días antes de la elección. *Si dicho partido no lo hiciere perderá el derecho a presentar su candidato.* Ningún partido presentará más de un candidato para cada cargo. Si un partido presenta dos candidatos para cada cargo deberá su organismo directivo

central decidir cuál es el candidato *que ha de figurar en la papeleta electoral*, por lo menos cincuenta días antes de la elección. El Secretario de Estado se regirá por dicha decisión y en caso de que dicho partido no decida en el término expresado se considerará como *candidato* de dicho partido el presentado en primer término. 16 L.P.R.A. sec. 445. (Bastardillas nuestras.)

Ese trámite —que armonizaba fácilmente con el requisito constitucional de elección especial como método para cubrir vacantes— daba en aquella época una opción al partido en cuestión para presentar "un candidato". Aún así, si el partido político no lo hacía dentro del término de 55 días, perdía el derecho a *presentar* "su candidato" que habría de figurar en la papeleta electoral. Ello nuevamente pone de manifiesto la diferencia y el tratamiento legislativo brindado bajo la ley actual en lo referente a los términos "candidato" y "candidatura". Al variarse por enmienda la fraseología de un estatuto, debemos presumir que el legislador intentó introducir una nueva regla, con distintos resultados y propósitos. *El Estado ex rel Lektrich* v. *Ydrach*, 77 D.P.R. 41 (1954). Tal enmienda o reenactación —introduciendo o supliéndole conceptos— es evidencia demostrativa de una intención de alterar su significado. *Pueblo* v. *Villalba*, 86 D.P.R. 318 (1962).

Al interpretar el Tribunal que si un partido selecciona un candidato es innecesario acudir al método supletorio de elección especial, en realidad lo que hace es equiparar tal método con aquel establecido en el cuarto párrafo de la ley, para atender vacantes ocurridas en el cargo de senador o representante por acumulación, o de distrito acaecidas *dentro* de los quince (15) meses precedentes a una elección general.

No hay indicios válidos en los cuales fundamentar ese trato análogo. Para cubrir esta última situación, la Asamblea Legislativa dispuso un mecanismo distinto y estableció unas dimensiones diferentes. Muy fácilmente pudo extender ese método para cubrir la vacante de legislador por

distrito, y no lo hizo. No podemos atribuirle a la Asamblea Legislativa tal *brutum fulmen.*

## II

Fieles a nuestra misión de sostener —en la medida de lo posible— la validez y constitucionalidad de una ley, hemos elaborado la interpretación que a juicio nuestro reconcilia los intereses en colisión: el reclamo de todos los electores y el interés de los partidos. Esa interpretación acata y recoge lealmente el lenguaje y las definiciones estatutarias y toma en cuenta los elementos lógicos.

Admitimos que el método que hemos detectado en la ley se aparta del clásico de primarias o del de designación directa utilizados tradicionalmente. Tampoco está exento de reparos. Ello dificulta que sea de fácil captación y entendimiento, y, a primera vista, suscita ciertas pre-ocupaciones en torno a la validez de obligar a los partidos políticos —bajo el supuesto de haber un sólo aspirante interesado— a que sometan la candidatura, o sea, más de dos aspirantes; también, si puede limitarse al electorado no afiliado a ese partido a votar por esos candidatos. Estas inquietudes se desvanecen recordando que, bajo el mandato constitucional vigente corresponde a la Asamblea Legisla-tiva —con sujeción a unos límites y a base del elenco de métodos disponibles— establecer aquel que estime más apropiado, a saber: (a) prescindiendo del partido político que originalmente nominó al legislador mediante la cele-bración de una *elección abierta* a todo partido, candidato y elector del Distrito en cuestión; (b) excluyendo parte del electorado a través de *primarias* limitadas a candidatos y electores afiliados *bona fide* del partido concernido; (c) descartando a todo el electorado con el método de *nomina-ción directa* de un candidato; y (d) una *combinación parcial o total* de cualesquiera de esos métodos (elección especial).

Ciertamente, si la Asamblea Legislativa válidamente puede excluir al partido político que originalmente nominó al legislador (elección abierta), o descartar a todo un electorado (nominación directa) o parte del mismo (primarias), puede sancionar y diseñar un método *combinado* de esos, que provea alternativas limitadas bajo unos requisitos y opciones. Nuestro disenso no se debe al potencial de métodos que el Poder Legislativo puede configurar, sino a la interpretación y lectura que sobre el *presente estatuto* se hace. En última instancia, la sabiduría de ese método es asunto ajeno a nuestra competencia, pues la "distinción de las leyes en odiosas o favorables, con el propósito de restringir o extender sus disposiciones, no puede ser hecha por aquellos cuyo deber es interpretarlas". Art. 21, Código Civil, 31 L.P.R.A. sec. 21. Aun bajo la hipótesis de que no fuera sabio, no podemos endosar una solución que en aras de los partidos políticos relega a segundo plano a todos los electores de un distrito representantivo y les limita un derecho plasmado estatutariamente. En materia de hermenéutica, en la dimensión electoral-constitucional favorecemos el escrutinio estricto y la protección máxima permisible en una democracia.

En su dinámica operacional, la interpretación mayoritaria tiene como consecuencia inmediata privar al electorado del Distrito Representativo Núm. 31 de su derecho a participar en la elección especial. A largo plazo, también inhibe a todos los demás electores en situaciones análogas de futuras vacantes, pues es ilusorio y utópico esperar que los partidos políticos vayan a omitir presentar su candidato dentro del término de 60 días y entre en juego lo que el tribunal denomina "segunda alternativa".

En decisión reciente admitimos la importancia de los partidos políticos, pero aclaramos que los mismos, "constituyen un medio y no un fin. El sujeto principal de la arquitectura moderna constitucional-electoral tutelado es el elector individual. El partido no es el elemento ulti-

mador, sino un vehículo de expresión individual, que se suma a otros para resultar y viabilizar la expresión colectiva ciudadana. Así, toda ley de actualidad, regulatoria de la franquicia electoral se ha encaminado hacia el reconocimiento de la 'prevalencia de los derechos electorales del ciudadano *sobre los derechos* y prerrogativas de *todos* los partidos y agrupaciones políticas'. (Bastardillas nuestras.) (Art. 2.001(11), 16 L.P.R.A. sec. 3051(11).) Al final de cuentas, este derecho individual es el verdadero destinatario y receptor del sistema, *por lo cual es de incuestionable interés público salvaguardarlo contra las posibles injusticias que de vez en cuando el choque de intereses de los partidos puede generar". P.S.P.* v. *Comisión Estatal de Elecciones,* 110 D.P.R. 400 (1980). (Bastardillas nuestras.)

A tono con esa perspectiva, somos de opinión que —salvo la ineludible aplicación de un diseño constitucional expreso y distinto, *García Passalacqua* v. *Tribunal Electoral,* 105 D.P.R. 49 (1976)— la regla de hermenéutica judicial por excelencia que debe prevalecer en el área del sufragio —cuando chocan los intereses de un partido político frente a los de un electorado— es aquella que brinda a éstos supremacía. En el caso de autos, la interpretación restrictiva del estatuto, que, pudiendo evitarlo, subordina el derecho de los electores a intervenir en una elección para llenar la vacante vulnera ese enfoque. Así, con miras a llenar las lagunas y suplir las contradicciones que emergen de esa interpretación —y armonizarlas al resultado— la parte final dispositiva de la opinión mayoritaria, en función eminentemente legislativa e invocando la equidad, ha precisado la formulación —más que de un trámite— de una nueva redacción de parte sustancial del texto del Art. 5.006. Ello necesariamente invierte la cronología de los términos legales originalmente previstos, redefine y establece un método distinto al contemplado, limita los poderes del Ejecutivo, y elimina la participación de la ciudadanía en el proceso, para beneficio de los partidos políticos.

Deferencialmente creemos que la interpretación restrictiva del Tribunal sitúa el estatuto en el umbral de un decreto de inconstitucionalidad. En nuestra misión de promover la constitucionalidad de toda ley —*Negrón Soto* v. *Gobernador*, 110 D.P.R. 664 (1981)— deberíamos evitar esa posible consecuencia. La forma de prevenirlo es leyendo lo que el Art. 5.006 *dice* y, en consecuencia, declarando que crea un método que protege al partido político al cual pertenecía el legislador que ocupaba el escaño, con la celebración de unas elecciones circunscritas a candidatos afiliados al mismo, pero con la participación de todo el electorado del distrito correspondiente.